Let's take up the next case in the matter of the estate of P.M.T.W. Argument for the appellant. May it please the court, good morning, your honors. My name is Jim Hanson. I'm the attorney for the appellant. This case comes before you on an order entered in the circuit court, Wayne County, appointing a guardian of a child. I represent the father of the child. We're asking that it be reversed. The issue before you is the court's finding on standard. In my brief, I've asserted to you if you look at the findings of fact and the specific things stated by Judge Overstreet, it appears that he was trying to determine what was in the best interest of the child, although our statute requires that you not get to that point until you've found it that the party is not willing and able to care for their child. In other words, we have a strong constitutional belief that parents have a right to raise their own children. The particular statute involved, and by way of fashion, your honors, that about six weeks prior to April 14, 2015, the mother or the mother of the child's mother or the grandmother or maternal grandmother filed a petition for guardianship of the minor and an emergency petition for guardianship, and on that same day, an emergency order of guardianship was entered, basically divesting my client of his parenting rights without even being in court that day. I ask the court to note that there is no specific provision in the guardianship act for an emergency order of guardianship. There are provisions in the juvenile court act that you can, or DCFS, they can go and have placement of a child in an emergency, but this was not an emergency. In fact, the allegations in the petition were not of an emergency. They were to maintain the status quo, best interest types of allegations, as well as contained in that petition. So here we are on April 14, 2015, emergency orders entered. One month later, my client, through other counsel, appears and files a motion to dismiss, which was denied on May 20th. A mediation order was signed by the judge directing mediation, and a setting was set ultimately in the fall, so in November. Six or seven months later, for a hearing on stage one, stage one is the willing or able standing part of the case. At that hearing, the court found that my client, that the petitioner had standing. I draw the court's attention to the Supreme Court case of Enright RLS, which spoke to this whole issue of balancing the rights of parents against third parties coming in and taking custody of their children. In that case, it was kind of developed around the two different statutes that pertain to that. One was in the Family Law Act, if you wanted to get custody of a child, and the other one was in the Probate Act, if you wanted to get guardianship. They're somewhat similar in that they put a person in the parent's position to raise a child. In the Probate Act, which was a subject matter of the Enright RLS Supreme Court case decided in 2006, they decided that 511B5 of the Probate Act noted that petitioners could establish standing if they could rebut the presumption that the minor of the willing parent, adopted parent, or adjudicated parent whose parental rights have not been terminated. In this case, with no question of fact, my client's rights have not been terminated. The whereabouts are known. My client appeared in the proceeding. But the third one, who is willing and able to make and carry out day-to-day child care decisions concerning the minor, that's the statute along which the first stage hearing would be had. The Probate Act also has a section 11B7, which basically recites in the statute the Superior Rights Doctrine that we're familiar with regarding parents. It actually says in Part 1 of that statute, if both parents of a minor are living and are competent to transact their own business and are fit persons, they're entitled to the custody of the person of the minor and the direction of his education. So we have two provisions in this Probate Act pertaining to guardianship. One is if both parents of a minor are living and competent to transact their own business and are fit persons, so the implication is if they're not unfit, they are entitled to the custody of the person of the minor and the direction of his education. It goes on to talk about if one parent is dead and some other things that don't really apply to our facts here. So the Superior Rights Doctrine is not only incorporated in the statute, but has also been incorporated into the case law of our state, and in particular, Supreme Court cases. The same Supreme Court case recited the federal U.S. Supreme Court cases of Tocqueville where we talked about the importance of the constitutional fundamental right of the parent to raise, and just for purposes of my argument, in that Troxell case, which was cited in the RLS, our Supreme Court case, the court repeated that the liberty interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the court. By allowing any person to petition for visitation at any time and allowing the court to grant visitation rights, this was in a visitation, Troxell was a grandparent visitation case, a savvy subject for visitation decision by parent and state court review. Second, there had been no court finding or re-navigation that the custodial parent was unfit. The court noted the presumption that fit parents act in the best interest of their child. The court explained so long as the parent adequately cares for his child or her children, i.e., is fit, there will normally be no reason the state should inject itself in the private realm of the family to further question the ability of that parent to make best decisions concerning the rearing of the parent's child. Now, that case came before our Supreme Court in the Wickham case, which was the grandparent visitation case, where they incorporated that same line of reasoning in basically striking our then grandparent visitation case, saying that you have to give a threshold you've got to get over before you can. In this case, that threshold is willing and able. But the court seemed to read into that willing and able some judgment about the quality of what a parent can perform at a better level or not of child rearing, and that's not what this Supreme Court case, as stated by our Supreme Court, conflates. It's a very significant right that a parent has. In this case, when the mother elected to sign over her rights to her mother, my client didn't elect to sign his rights over to her mother. He wanted to step in and take the child. He didn't get that chance. There was an emergency order without anything that would ever stand muster in a fitness hearing of the Juvenile Court Act. And then some months later, or a month later, when he filed his dismissal, he was denied that. Of course, the child stays in the custody of the grandmother. And then seven months later, when the hearing's gone, many of the factors that Judge Oakstreet referred to was how often he came to visit during these seven months, and a lot of factors that are irrelevant to the underlying premise that you have to establish, willing and able. Now, willing is not defined in our statute, although in the NRA RLS case, the court put a very low threshold definition on willing. In fact, the court said willing is defined as not refusing to do something. That's pretty low. It's not that you're more willing or less willing. You're just there to say, I'll do it. The other part of the analysis is able. And able's a little more compelling. You know, you've had cases where you have a drug addict parent or something like that who can't take care of herself, much less a child. But in the context of standing, it's a different threshold. It's not who's best able, it's just able. And the court in that same RLS case stated the Blacks' Law Dictionary of able to say, possessed of needed powers or needed resources to accomplish an objective. When you're asked to review the facts in this case, you'll see that Judge Overstreet actually found that my client was able. He just found that he was not willing. Counsel, refresh my memory. Was that finding an oral finding or was that included in the written court? He kind of picked up the statutory language and said the statutory language. He found that the father was not willing and able, you know, willing to meet those needs. But there were those findings as to what was in Judge Overstreet's mind as to willingness other than what he stated. That's where he stated things like, one that was in particular, is that because my client had had a domestic dispute with the mother and it was a pending domestic case in another county, Judge Overstreet says this relationship, this relationship between the mother and father is not a good thing, which is a best interest analysis. And he also stated, and I cited in my brief, that he said the father says he's willing and able, but we have to look deeper. We have to look deeper than that. And something about the founder, he did not think that this relationship between the father and the mother was best for the child. In other words, he was jumping over, I felt, to a best interest standard before we even got to where the father says I'm willing and able. So before the father had ever done anything that would relate to fitness, you know, no action for fitness had been filed against him or anything like that, we're looking at what's best for this child, which that is the underlying premise that I'm saying. We don't get there. I'm arguing, Your Honors, that should adopt principle. We don't get to decide whether or not the father would or wouldn't do a good job if he has the kid. We say he has that paramount superior right to raise this kid, and unless somebody comes into court and gets an order saying that he's hurt the kid or some serious endangerment or some other factor that's contained with the other provisions of the act, then he gets to raise this kid. In other words, the mother doesn't get to sign her rights over, give it to the grandmother, go into court, get an emergency order, take the kid away from him, and then raise the kid without him having a chance to raise the kid. I'm arguing, too, that's a big deal. If we had somebody come in and say, oh, we want to raise your kids, and you'd say, I'm willing to raise my kids, I'm able to raise my kids. Well, you don't know he's been a great father. Well, some of the things Judge Overstreet related to was the fact that he was not around as much when his kid was young and that he deferred to the kid being placed with the grandmother because the mother, his girlfriend, the mother naturally, which we see a lot, takes the kid over to Grandma and leaves her there a lot of the time. So he's holding that against the father even though he's working 50 hours a week, and that's what the record was. And the mother, even the grandmother testifies that she doesn't think the child would come to any harm. She just doesn't think it's best for the child. And so I ask Your Honor to read, if you wouldn't be so kind as to read what I point out in these findings to see if you agree or disagree with me about whether Judge Overstreet was really jumping to the next stage, the best interest, as opposed to just willing and able. Able to me is you can have a threshold of able being the best mother in the world. You can have an able being a person that's got two arms and a desire. And I think in the context of our Constitution and our statute that willing and able wasn't intended to mean something higher. Matter of fact, there was a Newsom case that came out that was dealing with this issue between the Divorce Act in custody and the Probate Act in custody, and the issue there was in the Divorce Act it required an involuntary relinquishment of custody or where you left the kid with somebody for a long period of time. That was the issue in the Newsom case. And as the Newsom case was happening, because there was a distinction, why do we have one extra factor to consider in a divorce case that we don't have in a probate case? There's kind of a legal protection argument or something like that there, because why do married patients get treated, parent and parents get treated somewhat differently than perhaps a paternity type of situation? And after the Newsom case, they passed the legislation that added the standing provisions of the Probate Act. I believe the reasonable reading of that is that was to basically put that hurdle in there saying if a parent is willing and able, and I think that you can take a common meaning of that, willing and able, not a long more able or less able analysis, just willing and able, not a fitness issue, that the parent gets that chance. So in this case, whenever a mother says, I don't want to do it anymore, the father should have the chance to be able to care for his kid and not have some third party who's maybe more able, because there's always a parent out there that could be better than even myself or Your Honors in raising kids, have more time to give or more skills or more nurturing. So this case turns on that issue of whether Judge Overstreet, the findings that he made or the statements he made in court were or were not the appropriate standards to apply. In other words, I'm saying he applied the wrong standard of proof by saying best. When I read this thing, to me, it looks like he's making a judgment about what he thinks is best and not what he thinks about whether a father, he doesn't say the father is disabled or has no ability to do these things. He also doesn't, he doesn't make any statements about, he says the father has a place to live, he says the father has income, the father has these different qualities about him, but then he turns around and doesn't let the father exercise those qualities. So Your Honors, for those reasons, I asked you to look at those statements the judge made, and I cited my brief and also in the record about how he arrived at what's best for this kid. I have a quote here. Let's see if I can get my hands on it. Fair work to you, Your Honor. In the record approximately 279, the judge says, makes a statement to Dustin. He says that Dustin says he will be, that he will have someone watch Peyton when needed, which the court says he believes Dustin's mom and dad would help out, but makes the comment that Dustin never did say who and mentioned the possibility that Danielle, that's the mother, might, but then notes that Danielle already consented to her mother doing so, so he kind of says that's kind of out of, that's out of the picture. Danielle's not in play anymore. Another issue discussed by the court was the taking of Peyton over to Sarah's, that's the grandmother, on repeated occasions during the early months of the child's life disappeared, and not my comment, but disappears without any objection by Sarah. In other words, Sarah, the grandmother, is not objecting to the kid coming over to be there. In fact, I've had dozens of divorce cases where that's a common. Thank you, Counselor Neal. I have a chance for your vote. I'll argue with the appellee. Good morning. I'm pleased to court, counsel. My name is Curtis Martin. I'm with the Sheriffs' firm, Shaw & Martin, here in Yonge-Burton. I represent the petitioner, I believe, Sarah Hatchett, the grandmother of the child. Dustin, the father, is essentially asking for a duel here and seeks to do that, at least in argument of the brief, by the exclusive application of the de novo standard of review to the facts of the case. But that's not correct because this is a hybrid or a mixed standard of review here because the trial court actually conducted the hearing, took facts on November 5, 2015, with regard to the standing issue before it ever decided to proceed to the best interest data, which then took place at a hearing in January of this year. The mixed standard is referred to in the KRJ case from the Fourth District that was cited in my brief. And the manifest way to the evidence is the standard to be applied to the facts that Judge Overstreet made in the November 5 hearing. And then the de novo standard is applied to the legal application of the law to those facts that were found by the judge. This mixed standard, I suggest, is very significant because of the factual findings that the court made and because of the manifest way to the evidence that must be applied to those facts. And the KRJ case indicates that the trial court's decision is against the manifest way to the evidence only if, when you first view those facts in the light most favorable to my client, Sarah, that there is an opposite conclusion that's clearly apparent, that the finding is palpably erroneous or wholly unwarranted, is clearly the result of passion or prejudice on the part of the court, or appears arbitrary and unsubstantiated by the evidence. So we have to look at what the trial court found. And I want to stop and diverge for just a moment with regard to counsel's argument about the emergency order that had been entered. You will not find in the record anywhere that that emergency order was challenged. Yes, there was a motion to dismiss the petition file under Section 2615, but there wasn't a 2619 motion to say, wait a minute, the petitioner here doesn't have the right to come in and seek an emergency order under statute or case law. Not challenged anywhere in the record. The 2615 motion was denied by the court, primarily relying upon the AW case that I cited in brief, where the court says, well, in order to determine whether there's standing, you really need to have a factual hearing. You really can't address that at some motion hearing or based on affidavit alone. You need to take evidence. And that's exactly what happened on November 5th. So that's why the motion challenging the petition was denied. But then moving to the facts of the trial court, factual findings that the trial court made after the November hearing, the court begins the hearing right out the gate by properly reciting the standard for standing that my client, the burden she had to prove, and that's under the Section 11-5 subparagraph B of the program act. She could proceed with this guardianship of the child that is not hers when she rebuts the presumption that is afforded to Dustin. The counsel argued about the Constitution and their parental rights and so forth. But she can still proceed with that, even though he's alive, he's around, his parental rights haven't been terminated. If she shows, simply by the preponderance of the evidence, that he's not able or willing, because the statute said he needs to be able and willing to make the day-to-day care decisions for his child. Counsel, do you agree that the trial court found him able? Yes. The trial court found him not willing. Not willing. So we need to concentrate on willing. That's exactly right because that's the challenge that my client made before the trial court. That's what I'm arguing here before you. That he may have been able because he had a job, he had a home. He just wasn't willing. And the court prefaces its finding by saying we've got to look a little deeper. And I think those are the exact words. Deeper than what just Dustin said. Had to look at what he did or, more specifically, what he didn't do with regard to this child. At the time of the hearing, the child was 11 months old. So we didn't have a whole lot of life here to consider. But I will state to the court that the evidence reflected that for nine of the 11 months at least of this child's life, my client was providing the exclusive care for this child. Counsel, let me ask you this. It gets into this emergency order and I think the issue that the father had with that. How old was the child when the temporary guardianship order was in? About five months. The child was born in December. The petition was filed in April. So you'll get a chance to read about it. So during a large period of that time, the majority of that time, that temporary guardianship order for the maternal grandmother was in place and she could limit how much dad and didn't limit how much dad saw the child. Well, I would disagree with you. She didn't. In fact, the testimony of both parties was she didn't interfere with his right to see his child in any respect. Any time he asked, very few times, any time he asked, he accommodated her. Say one. One time she said, I had a conflict in my schedule. I couldn't accommodate him, but he even offered to make that up. Any time he asked, she accommodated. There just weren't very many times he asked. In fact, the time between the time the child was born and the time the petition was filed, he saw this child about two times when the daughter took the child to see him, and it was only for a couple of hours those times. This is the testimony that was presented. And, in fact, during this period of time, my client was providing the exclusive care for the child. The child was taken to the emergency room not once but twice for an illness within a short period of time. The first time, the parents show up, but the child goes back with my client. The second time, the parents don't even show up. And this was within a span of time where the care she was providing would be, she described it, a cycle of days. There would be days when the child was with her exclusively. Then the child might see either one of the parents for a short period of time gets right back with her. These periods of time just grew and grew and grew until the domestic violence issue came up in February of 2015 when the mother and the child came back to my client's home. And from February 20th, 2015, until the petition was filed on April 14th, I believe it was, of 2015, this child was cared exclusively by my client, having seen her father two times for a couple of hours. Four hours within a two-month period of time, this young man saw his child. After the petition was filed, the testimony was, and the evidence was unrebutted, that she had indicated to him, anytime you'd want to see your child, let me know. And he did. And she accommodated. There even came a point in June of 2015 when he had made a request and said, hey, I'd like to see my child on Mondays, Wednesdays, and Fridays. His idea. She said, sure. Before it even came to the point that that arrangement could come to fruition, he tells her, oh, I've got to go out of town. I've got to go out of state, job, whatever it was. The guy never asked her again from that point until the date of the hearing to see his child. He just didn't exercise it. And because he didn't follow through in June of 2015, my client, on her own initiative, contacted his mother, Cindy Waters, and her father, his father, to make arrangements so the other set of grandparents could see the child. And my client, Sarah, and Dustin's mother, Cindy, made arrangements between themselves. Dustin wasn't involved in this at all. So that Cindy and that side of the family, presumably including Dustin, couldn't see the child. And they made arrangements for every week visits on Thursdays and Fridays. And that's the way it had proceeded from late June until the hearing in November of 2015. So for five months' period of time, it was Cindy and my client who had the arrangements and were involved in the exchanges. Dustin wasn't involved in that. During that period of time, he didn't ask for any additional time. And the argument is, well, why would he have to ask any additional time from my client? Because he was seeing his child through the visitation time that his mother and father had the child. But I ask this court, who better to ask for more time than just a Thursday and Friday to see your child than my client, the one who has a court order that says she's the temporary guardian? He never does that at all. He provides little or no financial assistance to her. He provides little or no material assistance to her during this period of time. And never asks for anything more than what my client arranges with his mother. So this isn't about ability. This is about willingness. And the trial court made the findings that through his actions, or more appropriately, his actions, he just didn't show his willingness. In determining whether or not he's willing, would it have been proper for the trial court to look at his pursuit of this litigation and the fact that he had filed an attorney action seeking custody? Would that have been proper, and did the trial court look at that? The trial court did make note of that. It did say that it said we've got to look a little deeper than what Dustin said, or just because he filed a petition. Because I'll note, and the record will reflect, he did nothing else but file a petition for an attorney, basically. And that was only after the petition for guardianship had been filed about a month later. And they were consolidated by the court, and they proceeded from that point forward. He never filed even a petition to say, I'd like to have some visitation. I'd like to establish this Monday, Wednesday, Friday, or anything else. Nothing was filed. He didn't do anything through the courts. He didn't do anything to approach my client personally. He just did nothing. And that's what the court made note of. The court remarked, he let Grandma raise this child. He didn't step up to make day-to-day care decisions. He never actually cared for the child on a day-to-day basis himself. Now, the court did make reference to the domestic violence and this volatile relationship that the parents had between them. But he made reference to the domestic violence charge being in February of 2015 only as it related to the mother taking the child to come back to my client's home. And the trial court specifically said, I'm not going to hold this domestic violence charge against you. It specifically said that. So there wasn't any arbitrariness. There wasn't any prejudice displayed toward him. But it took into consideration the entirety of the circumstances. We have a child that by this time was 11 months old, and this young man's father hadn't seen his child but a handful of times and hadn't been involved in any decision-making for this child. Counsel, let me interrupt you and ask another question. The statute does not define Willie. Correct. And I think you want to hold that in your brief result to the dictionary defining Willie or arguing that. And I take it you would have submitted some prior authority within this jurisdiction or other jurisdictions if there were definitions by other courts as to Willie. Yes, sir. I did not find anything that would define Willie, and I don't think counsel did either. I agree with the definition that he set out, that it means someone who's quick to act or ready to do something without being persuaded. Let me give you my question here. You looked in Illinois. I don't know, but I'm guessing that maybe this Willie and Abel is used in other states, other jurisdictions. Did you go any further than that? No, I didn't. Thank you. I didn't. But getting back to that ready to do something without being persuaded I think is significant here because my client testified, and it was not rebutted by Cindy, Dustin's mother. My client testified that during an earlier conversation before the petition was ever filed between the grandmothers, they were discussing that neither of the parents were stepping up to take care of this child. And Cindy had commented to my client, Sarah, that, you know, we almost have to make Dustin mad in order to see his child. My client testified specifically to that. Never rebutted it. That's an example of someone who has to be persuaded. That's an example of someone who's not willing to take care of their child. And that's what this is all based upon. It's what Dustin, not what he said, but what he did or didn't do that is significant here that the court considered. The court didn't deal with best interest here. In fact, the court was very careful when evidence was attempted to be presented to deal with the issue of whether this dealt with the standing issue as opposed to best interest issue and specifically segregated the hearings just like the statute requires between the standing hearing and then later the best interest hearing. Now, Benjamin Franklin said back in the day that well done is better than well said. I think it's applicable here. Dustin may have said all sorts of things about how he wanted to take care of his child. He's got to move beyond that. That's what the trial court did and looked at his actions. In the AW case that I cited in my brief, this court just three years ago recognized that the court can take into consideration the past conduct of a parent as it relates to their basically the abdication of their responsibilities towards their child. And that's what the trial court probably looked at. Do we have time for one more? I sit back and listen to people characterize facts. That's the way I see them. I always get perplexed. But I would ask Your Honor to close your eyes and rely on the findings of what Judge Overstreet said to know where his mind was at. And what he said, and counsel suggested it wasn't on his mind, what he said is the court is troubled by the relationship that was adversely affected to the child. That's at Record 279. Now being asked to find that Dustin is willing and able to make day-to-day child care decisions for the care of the child. So that troubles me. So, you know, if you think about this in the context of them saying that my client did not want to see this kid. When you read the record also you'll find testimony that the grandmother wanted supervised contact between my client even though he'd never done anything. So any business he had to have, had to be with his parents. That was the only thing that was approved. And to hold him culpable because they're making it difficult. I mean, Mr. Martin filed this action in winning the court and got a versus the order taking this child away from my client. He filed that action without having a standing hearing before that order was entered. But the city argued that my client hasn't done what he can. He went and hired a lawyer, maybe a lawyer who's not as quick. But they were back in court in a month to dismiss the case and it wasn't dismissed. And at that time there was no vacating of the order even though at that point the parties are talking about the fact that there's been no standing determined that we're going to set up for a stand. That's kind of like getting the cart before the horse. Before there's any reason or any petition filed to take this child from the father. We've got the child taken from the father. We've got all these facts that are being used against him to say that he's not a good father. He's spending his money, time, efforts. And the testimony you'll see in that hearing is that he saw his kid every week, Thursday and Friday. Counsel suggested he didn't want to see the kid more. I don't know that they would have let him see the kid more. But that doesn't even get to where we're at. Willing and able. I did not find any cases in other jurisdictions, but I quite frankly didn't spend a lot of time looking because I didn't know that it would be necessarily relevant in this case. But I did find our own court saying in the RLS case. Something that speaks to that issue. In that case, it says. Willing is defined as not refusing to do something. That's one definition of black and then Webster actually. And that came out of the RLS case. That was our Supreme Court case. They could have picked any dictionary they wanted. Or doing something or ready to do something without being persuaded. You can't even believe that my client would be hiring a lawyer to come to court saying I want my kid without believing that he's persuaded he wants to do it. So, I submit to you that he can't do it. And somebody saying it's not. It's not appropriate for you to do. We're going to stop you from doing it. We're going to let somebody else step in and do it. But the last part of that same case, it says. Because they in the Newsome case, they passed this additional standing provision of the probate act. And in that RLS case, they state under the reasoning of RLS. The legislature legislature meant the first method, which is not refusing to do something. So, I ask you to look at that case and read the context of the actually citation. I'll just read exactly what I quoted in the mic. In the RLS case, the court repelled the legislature clearly intended able as used in section 11.5B meant possessed of needed powers or needed resources to accomplish an objective. Webster's third new international dictionary. Willing is defined as not refusing to do something or quick to act or respond, doing something or ready to do something without being persuaded or done, made or given by choice. Under the reasoning of RLS, the legislature meant the first definition, which is not refusing to do something. That's just a little offhand comment here, but I don't think that's a wholly. But when you read that, when you read that in the context of our Supreme Court talking about how Troxel relates to parents and their rights to have a, I'm going to say, a practice raising their own kid before they're just out. But that standing isn't just what's best for this kid or whether this father visited more times than he should or less time than he could. He's before your honors asking to have his kid to raise instead of his the kid's grandmother. The other thing I think is unfair to him is he's out working as many man working families are. He's out working making a living. His wife is his girlfriend's raising his kid. Mother's offering to care for the kid as is common. Everybody seems to be good with it. Mother doesn't seem to think there's any problem with that. But all of a sudden, the fact that he put the kid with grandmother or allowed the kid to be with grandmother is a problem. I submit to you that's a red herring. I mean, that seems like a good decision to put somebody with somebody you have confidence in. But that's not what the case is about. It's not about the best interest. It's about a parent's right to make day-to-day decisions. And the other thing is that the day-to-day decisions regarding child care. The judge is not he has to make the he doesn't have to do the child care. It's make the decision. So you can put the kid with your mother, your sister, your brother, or they care. Thank you, counsel, to both of you. We'll take this case under advisement and issue a ruling. Whatever you want. Let's go ahead and take out the.